WALDRON v. FARGO.

(Supreme Court, Appellate Division, Fourth Department. May 22, 1900.)

EXPRESS COMPANY— WRITTEN CONTRACT— ORAL AGREEMENT — NEGLIGENCE — STIPULATION AGAINST LIABILITY—EFFECT.

Where plaintiff enters into an oral contract with an express agent for the transportation of a car of horses, and their delivery by a certain hour, and an agent of plaintiff authorized to ship, afterwards enters into a written contract with the express agent, before shipment, under which the company is not to be liable for injuries resulting from its negligence or from delay in transportation, the plaintiff will be bound by the written contract, and precluded from afterwards claiming damages for injuries resulting from such a delay, and failure to deliver by the hour orally agreed on.

Action by Patrick G. Waldron against James C. Fargo, as president of the American Express Company, to recover for injuries to a car load of horses. Verdict was rendered for defendant on direction of the court at close of the evidence. Plaintiff's motion for a new trial was ordered to be heard by the appellate division in the first instance. Motion denied.

The action was commenced on the 10th day of May, 1898, to recover damages which the plaintiff claims to have sustained on account of injury to a car load of horses, which resulted from the failure of the defendant to transport the same from East Buffalo, N. Y., to Bridgeport, Conn., according to the terms of an alleged oral agreement, and which failure occurred because of the negligence of the defendant.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

Irving W. Cole, for plaintiff.
John G. Milburn, for defendant.

McLENNAN, J. A construction of the evidence most favorable to the plaintiff, to which he is entitled upon this motion, tends to establish the following facts: On the afternoon of the 4th day of

April, 1898, the plaintiff, who was engaged in shipping horses from
East Buffalo to different parts of the country, entered into an oral.
agreement with the defendant, who was engaged as a common car-
rier of merchandise and live stock throughout the United States, by
which the defendant, through one Todd, its soliciting agent at East
Buffalo, agreed to transport a car load of horses for the plaintiff
from East Buffalo, N. Y., to Bridgeport, Conn., in a car furnished by
the plaintiff,—the same to leave East Buffalo by an express train on
the New York Central & Hudson River Railroad at 8:05 o'clock.
on the morning of April 5, 1898,—and to deliver them at Bridgeport
at or before 10 o'clock p. m. of the same day, for the price or consid-
eration of $175, which the plaintiff promised and agreed to pay.　At
about 7 o'clock on the morning of April 5, 1898, the plaintiff, through.
his duly-authorized agent, a Mr. Burris, who had full power and au-
thority to act in the premises, took 27 horses from his stable in East
Buffalo, to where his car was standing upon a siding of the New York
Central Railroad, for the purpose of loading the same.　The agent of
the defendant met the plaintiff's agent in defendant's office, which.
was in the vicinity of where the car was standing, and before any
of the horses were loaded he prepared a live-stock agreement or ship-
ping contract, so called, upon the regular blanks of the defendant fur-
nished for that purpose, signed the same, and presented it to plain-
tiff's agent, who signed plaintiff's name to it, by himself as agent,
which he had authority to do.　After signing it, plaintiff's agent di-
rected Mr. Todd to deliver the same to the plaintiff.　Mr. Todd also.
made out a shipping bill or bill of lading of the horses, marked
thereon the freight, $175, paid, and thereupon the horses were loaded
into plaintiff's car by his employés under the direction of his agent,.
Mr. Burris.　The car was then attached to the express train of the
New York Central & Hudson River Railroad Company leaving East
Buffalo at 8:05 a. m., and was started on its journey to Bridgeport..
The plaintiff's agent did not read the live-stock agreement or ship-
ping contract signed by him, and testified that he did not know its.
contents, although he testified that he had frequently shipped horses.
by the defendant, and had previously signed and received similar
contracts.　Several hours after the horses had left East Buffalo, and
about 11 o'clock a. m. of the same day, the defendant's agent called.
upon the plaintiff personally, and delivered to him the shipping con-
tract which, through his agent, he had signed, and which his agent
directed to be so delivered; and the plaintiff thereupon paid to de-
fendant's agent the sum of $175, the amount of the charges for the
transportation of the horses.　The plaintiff did not read the contract,
but states that upon at least two previous occasions he had shipped
horses by the defendant, and had signed and received similar con-
tracts.　The car load of horses reached the city of New York on
schedule time, shortly before 9 o'clock p. m. of the same day; but on
account of some delay, for which the plaintiff was in no manner re-
sponsible, the car load of horses remained upon the tracks of the
New York Central Railroad in the city of New York until about 3
o'clock in the morning, and did not reach Bridgeport until about
6 o'clock on the morning of April 6th, when they were unloaded by

the plaintiff's employés and taken to a stable procured for that purpose. The horses were found to have been seriously injured upon the journey, and there is evidence tending to show that such injury was due to the fact that the car was left standing in the city of New York for such length of time, and because it did not reach its destination until 6 o'clock a. m. on the morning of April 6th, instead of at 10 o'clock on the evening of April 5th, as it was agreed it would by the terms of the oral agreement made between the parties. There is no evidence which would justify a finding that the delay in the arrival of the horses at their destination was caused by any willful or gross neglect on the part of the defendant, but it resulted because the character of the car, its size, couplings, etc., were such that the New Haven Railroad Company, over which railroad it was to go from New York to Bridgeport, refused to attach it to its express train leaving New York on the evening of the day such car arrived, and for that reason it remained upon the New York Central tracks in the city of New York until the departure of a freight train for Bridgeport over the New Haven Railroad.

The shipping contract, so called, signed by the parties to this action through their respective agents, provides, among other things, as follows:

"Now, it is agreed that said company undertakes, as forwarders only, to forward said property to the nearest point to destination reached by said company. It being understood that said company relies upon the various railroad and steamboat lines of the country for its means of forwarding property delivered to it to be forwarded, it is agreed that it shall not be liable for any damage to said property caused by the detention of any train of cars or of any steamboat or other vehicle upon which said property shall be placed for transportation, nor by detentions caused by custom regulations at frontier points, nor by the neglect or refusal of any railroad company or steamboat to receive and forward the said property. * * * In consideration of the undertaking of said company to forward said property as above mentioned, and of the reduced rate of compensation at which said property is to be so forwarded, said shipper agrees that said company, its agents, or any railroad or transportation company or carrier over whose lines the said property may pass, shall not under any circumstances, nor for any cause, be liable for any injury or damage to or loss of said property, whether or not the said injury, damage, or loss happen or arise from any fault, negligence, or carelessness, gross or otherwise, on the part of said company, its agents or servants; it being the intent of this contract that said property shall be forwarded entirely at the owner's risk."

The only question presented by this appeal is whether or not the rights of the parties to this action are to be determined from the alleged oral agreement, or from the written contract afterwards executed by the parties through their duly-authorized agents, and before the horses were loaded for shipment. If by the former, then, clearly, the plaintiff's right to recover depends upon the existence of certain facts deducible from the evidence, and which it was the province of the jury to determine. If by the latter, it is equally clear that the plaintiff failed to establish a cause of action, and that the learned trial justice properly directed a verdict for the defendant.

It must be assumed that Mr. Todd, as between the defendant and the plaintiff, had full power and authority to make the oral agreement in question, notwithstanding the limitations upon his authority

imposed by his principal, because such limitations were not brought to the knowledge of the plaintiff, and his apparent authority under the circumstances was his actual authority. At least, if material, it was a question of fact for the jury upon all the evidence. Isaacson v. Railroad Co., 94 N. Y. 279. It must also be assumed that Mr. Burris was the agent of, and had full authority to act for and to bind, the plaintiff in all things relating to the shipment of the car load of horses in question. The plaintiff testified:

"Q. Mr. Waldron, is that the paper delivered to you [shipping contract] with respect to the shipment of this car of horses? A. Yes, sir. Q. This is signed, 'P. G. Waldron, Shipper, George Burris.' That was your agent,—your man,—was it not? A. Yes, sir. Q. He attended to the shipment? A. Yes, sir."

In the case of Root v. Railroad Co., 76 Hun, 23, 27 N. Y. Supp. 611, the rule is stated in the headnote as follows:

"An agent to ship has power to contract as to the terms and conditions of shipment, and it is an error requiring the reversal of a judgment in favor of the plaintiff, in an action brought to recover the value of a horse shipped for transportation, and fatally injured through the carrier's negligence, to submit to the jury the question whether plaintiff's shipping agent had authority to bind his principal by a contract, and to refuse to charge that such agent possessed such authority."

In Jennings v. Railway Co., 127 N. Y., at page 447, 28 N. E. 396, the court says:

"Ordinarily a person authorized to deliver and delivering the property of another to a common carrier for shipment may by the latter be treated as having authority to stipulate for and accept the terms of affreightment, and as against the carrier the owner is bound by them."

Nelson v. Railroad Co., 48 N. Y. 498; Shelton v. Transportation Co., 59 N. Y. 258.

If the written contract in this case became binding upon the parties at all, it became so at the time it was executed, and their rights under it then became fixed. The fact that it was not delivered to the plaintiff personally until several hours after its execution is immaterial. The main purpose of a written contract is to merge the oral negotiations, and to put the real agreement of the parties in such form that each may know its exact conditions, and thus avoid misunderstanding on account of lapse of memory, and opportunity to secure advantage by perjury or other dishonest methods. 2 Pars. Cont. 548. The author says:

"But the principal cause alleged in the books and cases is that when parties, after whatever conversation or preparation, at last reduce their agreement to writing, this may be looked upon as the final consummation of their negotiations, and the exact expression of their purpose. And all of their earlier agreement, though apparently made while it all lay in conversation, which is not now incorporated into their written contract, may be considered as intentionally rejected. The parties write the contract, when they are ready to do so, for the very purpose of including all that they have finally agreed upon, and excluding everything else, and make this certain and permanent. And, if every written contract were held subject to enlargement or other alteration according to the testimony which might be offered on one side or the other as to previous intention or collateral facts, it would obviously be of no use to reduce a contract to writing, or to attempt to give it certainty and fixedness in any way."

The wisdom of the rule above stated could not be better illustrated than by the conflicting claims of the parties to this action respecting the terms of the alleged oral agreement. The defendant's agent positively asserts that no such conversation as is claimed by the plaintiff ever took place, that the conversation which was had differed in no essential manner from the written agreement, that he was expressly prohibited by the instructions of his principal from making such an agreement as the plaintiff claims was made, and that to make it would have been contrary to his universal custom and practice in the conduct of the duties of his agency. The evidence on the part of the defendant also tends to show that under the circumstances it would have been most unreasonable for the defendant's agent to have obligated it unconditionally to deliver the horses in question at the time named by the plaintiff. Such delivery, under the most favorable circumstances, would allow only a few minutes for the transfer of the car in New York City to a connecting railroad, and the slightest delay in making such transfer, or in transportation upon any part of either railroad, would render such delivery impossible. Notwithstanding all this, the plaintiff asserts with equal positiveness that the defendant, through its agent, assumed such obligation, and the performance of such duty.

The case of Germania Fire Ins. Co. v. Memphis & C. R. Co., 72 N. Y. 90, is, we think, decisive of the proposition that the written contract must determine the rights of the parties to this action, and that the oral conversation had between the plaintiff and defendant's agent can in no manner affect the same. That was an action to recover for damage to a quantity of cotton shipped by defendant's road from Memphis to New York, which was injured by fire while in transit. On the 17th of February, 1868, the owner of the cotton made an oral arrangement with the general freight agent of the defendant as to the rate of freight for the transportation of the cotton from Memphis to the city of New York. So far as appears, nothing was said about the liability of the defendant. On the day following, the cotton was delivered by the owner to the defendant; and after the delivery he received bills of lading similar in form to those which had been used on defendant's road for at least two years previous, and the owner of the cotton had previously received such bills of lading for cotton shipped. One of the clauses in the bill of lading exempted the defendant from liability for damage by fire. The owner of the cotton testified that the printed clauses and conditions of the bill of lading were not read to him at the time of the delivery thereof, and that he did not read them, but that without objection they were retained by him. The decision of the court in that case is stated in the headnote as follows:

"Where goods are delivered to a carrier for transportation, and before the goods are shipped a bill of lading or receipt is delivered to the shipper, the latter is bound to examine it and ascertain its contents, and if he accepts it without objection he is bound by its terms. He cannot set up ignorance of its contents, and resort cannot be had to prior parol negotiations to vary them. To take a case out of this general rule, it must appear that before the delivery of the bill of lading the goods have been shipped, so that the shipper could not have reclaimed them, had he objected to the contents of the bill of lading."

In Belger v. Dinsmore, 51 N. Y. 166, the headnote is as follows:

"In the absence of fraud, concealment, or improper practice, the legal presumption is that stipulations limiting its common-law liability contained in a receipt given by such company for freight were known and assented to by the party receiving it."

In Long v. Railroad Co., 50 N. Y. 76, the decision of the court is clearly stated in the headnote as follows:

"Where a shipper of property takes from a carrier a bill of lading, receipt, or other voucher, expressing the terms and conditions upon which the property is to be transported, the writing, in the absence of proof of fraud or mistake, must be taken as the evidence, and the sole evidence, of the final agreement of the parties, and by it their duties and liabilities must be regulated. Resort cannot be had to prior parol negotiations to vary its terms."

In the case of Kirkland v. Dinsmore, 62 N. Y. 171, the court says:

"It has been repeatedly adjudged in this state that the acceptance by the shipper, on the delivery of goods for transportation to a carrier, of a receipt or bill of lading signed by the carrier, expressing the terms and conditions upon which they are received and are to be carried, constitutes, in the absence of fraud or imposition, a contract controlling the rights of the parties."

Numerous other authorities to the same effect might be cited, all fully establishing the proposition that from the shipping contract, so called, in this case, the rights of the parties must be determined. The cases cited by counsel for the plaintiff in no manner conflict with the rule above stated. Those cases are authority for the proposition (which is well settled) that where, pursuant to an oral agreement, property is shipped by a common carrier, the carrier cannot modify or change such agreement by the contents of the shipping receipt afterwards delivered, and after the property shipped is in transit, and has passed out of the custody of the owner. That rule is not applicable to the facts in this case. The shipping contract was delivered to and signed by the plaintiff's agent before any of the horses were delivered to the defendant for shipment, and before they were loaded into the car, and the delivery and execution of such contract by the agent had precisely the same effect as if it had actually been delivered to and signed by the plaintiff personally.

The contract was not shown to be without proper consideration, and, if challenged for such reason by the plaintiff, it was incumbent upon him to establish that infirmity. The rate of $175 was fixed for the transportation of the horses from East Buffalo, N. Y., to Bridgeport, Conn. There is evidence tending to show that the regular rate from Buffalo to New York was $125. What the regular rate was from New York to Bridgeport, does not appear. The contract itself states, "In consideration of the reduced rates of compensation at which such property is to be forwarded," and the presumption follows that the sum named was a reduced rate of compensation. It is undoubted that a common carrier may make a contract relieving it from liability on account of its negligence resulting in loss or injury to the goods delivered to it for transportation, when such intent is plainly and distinctly expressed, and so that it cannot be misunderstood by the shipper. Nicholas v. Railroad Co., 89 N. Y. 370. In the case of Collender v. Dinsmore, 55 N. Y. 200, it was held that a common carrier may exempt himself from liability for his own neg-

ligence, if the contract of shipment contains apt words expressing such intent. In the case at bar the contract expressly relieves the defendant from liability for the damages which this action is brought to recover. It was a contract in ordinary use, and one which the defendant invariably required the shipper to sign before undertaking the transportation of his goods. The plaintiff was an experienced shipper of horses, as was his agent. Both had previously shipped by the defendant, and had received upon such occasions contracts in all material respects like the one in question. In this connection it may be proper to observe that, although the contract in question purports to relieve the carrier from gross negligence, that provision is unimportant in this case, for the reason that the negligence of the defendant, if it be conceded that it was negligent at all, cannot be characterized as either willful or gross. The case consequently does not come within the principle asserted by this court in Grand v. Livingston, 4 App. Div. 589, 38 N. Y. Supp. 490, affirmed in 158 N. Y. 688, 53 N. E. 1125. The conclusion is reached that the plaintiff's exceptions should be overruled, and judgment ordered for the defendant, with costs.

Plaintiff's exceptions overruled, motion for new trial denied, and judgment ordered for the defendant, with costs. All concur.